IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | |
| ) | |
| GOLDMAN INDUSTRIAL GROUP, INC., ) | Chapter 11 |
| et al., ) | |
| ) | Case No. 02-_10467 (PFW)_ |
| ) | |
| Debtors. ) | Jointly Administered |
| ) | |

**AFFIDAVIT OF RICHARD E. CLEMENS
IN SUPPORT OF FIRST DAY MOTIONS AND
APPLICATIONS**

| | | |
|---|---|---|
| STATE OF MASSACHUSETTS ) | | |
| ) | ss: | |
| COUNTY OF SUFFOLK ) | | |

I, Richard E. Clemens, being duly sworn, depose and say:

1.      I am the Chief Operating Officer of Goldman Industrial Group, Inc.

("**Goldman Industrial**"), Fellows Corporation ("**Fellows**"), J&L Metrology Company,

Inc. ("**J&L Metrology**"), Jones and Lamson Vermont Corp. ("**Jones & Lamson**"), Hill-

Loma, Inc. ("**Hill-Loma**"), Bridgeport Machines, Inc. ("**Bridgeport**"), and Bryant

Grinder Corporation ("**Bryant**"), debtors and debtors-in-possession (each a "**Debtor**"

and, collectively, "**Debtors**") in the above-captioned cases (the "**Cases**").  I am actively

involved with the management of Debtors and familiar with their day-to-day operations,

businesses, and financial affairs.  Except otherwise indicated, all facts set forth in this

Affidavit are based upon my personal knowledge as an officer of the Debtors, my review

of relevant documents, information provided to me by employees of Debtors, or my

opinion based upon my experience, knowledge and information concerning Debtors' operations and financial affairs.

2. I submit their affidavit in support of the first day motions and applications in the Cases. Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant first day motion or application.

## I. BACKGROUND

### A. General

3. Debtors provide metalworking machinery to manufacturers; marketing and selling original equipment primarily to the aerospace, automotive, computer, defense, medical, farm, construction, energy, transportation and appliance industries. Through the various operating companies, Debtors have manufactured and distributed machine tools and accessories for over 60 years. The Debtors' products include grinding machines, consumable gear cutting tools, gear production machines, optical inspection equipment and casting machinery and related accessories and services. Debtors' customers include Ford Motor Company, Chrysler Corporation, General Motors Corporation and Caterpillar Corporation, as well as many other industrial manufacturers.

### B. Debtors' Structure

4. Goldman Industrial is a wholly owned subsidiary of non-debtor Goldman Machine Tool Group Inc., a family-owned corporation based in Boston, Massachusetts. Goldman Industrial's ultimate parent corporation was founded by David L. Goldman ("**Goldman**") in 1982 initially as an investment banking firm. In 1986, Goldman Industrial shifted its focus exclusively to acquiring and managing operating companies.

Between 1986 and 1998, Goldman acquired five companies within the machine tool industry. Goldman Industrial is a holding company for the stock of operating businesses in the machine tool industry.

5.     Goldman's strategy has been to grow by acquiring companies that were experiencing financial difficulties, but which could nonetheless develop synergies with other Goldman Industrial subsidiaries. Goldman Industrial also sought to acquire companies from conglomerates that were divesting their non-core business at low points in the business cycle. Companies acquired by Goldman Industrial were typically leaders in niche markets within the machine tool industry and manufacturers of high margin products under strong brand names.

6.     Goldman Industrial is headquartered in Boston, Massachusetts. The other Debtors are operating subsidiaries of Goldman Industrial with production operations located in several places, including Bridgeport, Connecticut, North Springfield, Vermont and Gorham, Maine. Goldman Industrial also has a number of non-debtor subsidiaries including; (a) foreign subsidiaries located in the United Kingdom, Germany, Malaysia, Indonesia and China (the "**Foreign Subsidiaries**"), and (b) inactive sales companies (the "**Sales Companies**" and together with the Foreign Subsidiaries, the

7.　　Hill-Loma, a wholly-owned subsidiary of Goldman Industrial, was founded in 1894, formed as Delaware corporation in 1986 and acquired by a Goldman Industrial subsidiary in 1986. Hill-Loma's parent corporation was subsequently merged with Goldman Industrial in 1999. Hill-Loma principally manufactures casting machinery and related products for primary non-ferrous metal producers and precision grinding and surfacing equipment for metal fabrication and processing. After its acquisition by Goldman Industrial, Hill-Loma incorporated design improvements requested by customers into its product lines, implemented a flexible pricing structure, cut costs and implemented production improvements to shorten production lead time.

8.　　Hill-Loma employs 35 people at its locations in Gorham, Maine, Chesterland, Ohio and New Rochelle, New York. In order to maintain core assets and maximize value for all constituents in the Cases, the Debtors have decided to shut down Hill-Loma. The shut down of Hill-Loma was initiated prior to the Petition Date.

9.　　Fellows, a wholly-owned subsidiary of Goldman Industrial, was founded in 1896, formed as a Delaware corporation in 1974, and acquired by a Goldman Industrial subsidiary in 1987. Fellows' parent corporation was subsequently merged with

---

[1]　　Bridgeport is the parent corporation to the following Non-Debtor Subsidiaries: (i) Bridgeport Machines FSC, a wholly-owned entity formed in the US Virgin Islands; (ii) P.T. Bridgeport Perkasa Machine Tools, an entity 40% owned by Bridgeport and formed in the country of Indonesia; (iii) Engineering Geometry Systems, an entity 19.5% owned by Bridgeport and formed in the State of Utah; (iv) OASYS Group Incorporated, an entity 16.67% owned by Bridgeport and formed in the State of Delaware; and (v) Bridgeport Machines Ltd. a wholly-owned entity formed in the United Kingdom with wholly-owned subsidiary entities. Bridgeport Machines Ltd. subsidiaries are the following: (a) Chengdu Chang Zheng-Bridgeport Machines Co. Ltd., an entity formed in the country of China; (b) Bridgeport Machines SDN BHD, an entity formed in the country of Malaysia; (c) Bridgeport Machines GmbH, an entity formed in the country of Germany. Bridgeport Machines GmbH also has one wholly-owned subsidiary: Bridgeport Machines Vertriebs GmbH, an entity also formed in the country of Germany. Fellows, Bryant, Bridgeport and James & Lamson each have a wholly-owned sales company subsidiary which is inactive.

Goldman Industrial in 1999. Fellows offers a complete range of gear production machines for producing both spur and helical cylindrical gears, gear segments and linear "rack" gear components. These machines are used in high precision, close tolerance and high production applications. As of June 1999, Fellows was the only domestic producer of gear shaping machinery, enjoying a 65% market share for the automotive, truck, construction equipment and aerospace sectors in the United States and an installed base of over 37,000 machines.

10.     Fellows and Bryant employ approximately 5 people in Springfield, Vermont. In order to maintain core assets and maximize value for all constituents in the cases, the Debtors to shut down Fellows. The shut down of Fellows occurred prior to the Petition Date.

11.     J&L Metrology, a wholly-owned subsidiary of Fellows, was founded in 1919, formed as a Delaware corporation in 1987 and acquired by a Goldman Industrial subsidiary in January of 1987. J&L Metrology's parent corporation was subsequently merged with Goldman Industrial in 1999 and downstreamed to Fellows shortly thereafter. J&L Metrology invented the optical comparator and, through its parent Fellows, produced top quality optical comparator measuring instruments. These machines provide precise means to verify how accurately other processes have been performed on a component.

12.     J&L Metrology currently has no employees because its operations were run in conjunction with Fellows. In order to maintain core assets and maximize value for all constituents in the Cases, the Debtors decided to shut down J&L Metrology. The shut down of J&L Metrology occurred prior to the Petition Date.

13.     Bryant, a wholly-owned subsidiary of Goldman Industrial, was founded in 1909, formed as a Delaware corporation in 1988 and acquired by a Goldman Industrial subsidiary in May of 1988. Bryant's parent corporation was merged with Goldman Industrial in 1999. Bryant offered a full range of grinders for use by metalworking manufacturers who produce components with cylindrical surfaces. Bryant's machines are designed to be used in high precision as well as mass production applications. Bryant, is the only U.S. manufacturer of high-precision grinding machinery, with a 50% domestic market share as of June 1999 and an installed base of over 19,000 machines. Bryant's major markets included the automotive, bearing, aerospace, construction, compressor and oil field sectors. More specifically, Bryant machines manufacture fuel injector seats, needles and armatures for Ford Motor Company for all of its gasoline engines. Bryant machines also manufacture automatic transmission pump components for General Motors for all of its Cadillac, Buick Park Avenue, and light duty rear wheel drive vehicles. In addition, Bryant machines manufacture valve lash adjusters for all General Motors overhead cam V6 and V8 engines. Major quality awards received by Bryant include the Total Quality Initiative award from Association of Manufacturing Technology and the E-Star Export Award from the President of the United States.

14.     In order to maintain core assets and maximize value for all constituents in the Cases, the Debtors decided to shut down Bryant. The shut down of Bryant occurred prior to the Petition Date

15.     Jones & Lamson, a wholly-owned subsidiary of Goldman Industrial, was formed as a Delaware corporation in 1998 and acquired by Goldman Industrial in August of 1998. Jones & Lamson provides control retrofits, replacement parts, technical support

and after-market service to the largest installed population of turning equipment in the world. The Jones & Lamson brand name is well-regarded in the industry.

16. Jones & Lamson currently has no employees and was operated with Fellows from the Springfield, Vermont location. Jones & Lamson owns a 378,000 sq. ft. facility located at 160 Clinton Street, Springfield, Vermont. In order to maintain core assets and maximize value for all constituents in the cases, the Debtors decided to shut down Jones & Lamson. The shut down of Jones & Lamson occurred prior to the Petition Date.

17. Bridgeport, a wholly-owned subsidiary of Goldman Industrial, was formed as a Delaware corporation in 1939 and was acquired by Goldman Industrial in 1999. Bridgeport has designed and distributed metal cutting machine tools and accessories for over 50 years. Bridgeport manufactures manual and CNC milling machines, machining centers, surface grinders, lathes and computer-aided manufacturing software. Bridgeport enjoys an industry-leading brand name and maintains the industry's largest installed base of milling machines. Bridgeport is the leading manufacturer of manual milling machines, surface grinders and CNC manual tool change milling machines in the United States and is the market leader in sales of vertical machining centers in the United Kingdom.

18. Bridgeport has 230 employees at locations in Bridgeport, Connecticut and Elgin, Illinois. Bridgeport also has sales offices in Webster, Massachusetts, Rochester Hills, Michigan, Glendale, Wisconsin and Bristol, Pennsylvania. Bridgeport also owns the Non-Debtor Subsidiaries which have manufacturing facilities in Leicester, England and Kempten, Germany.

## C.    **Capital Structure**

19.    The Debtors and the Foreign Subsidiaries are obligors under the Loan and Security Agreement dated as of August 19, 1999, among the Debtors, certain of the Foreign Subsidiaries and Fleet Capital Corporation ("**Fleet Capital**"), Congress Financial Corporation, The CIT Group/Business Finance, Inc. and Provident Business Credit,  (the "**Senior Lenders**") and ING Barings ("**ING**", together with the Senior, the "**Lenders**") and Fleet Capital as agent for the Lenders (the "**Bank Facility**").  The Bank Facility provides a revolving credit facility in the maximum principal amount of $71,000,000 (the "**Revolving Credit**")[2] subject to a borrowing base and term loans in the original aggregate principal amount of $31,500,000 (the "**Term Loans**").  The Term Loans include (a) a $15,000,000 term loan to the Debtors (the "**Domestic Term Loan**") made by ING; (b) a $8,500,000 term loan (the "**UK Term Loan**") to Bridgeport Machines Ltd. ("**Bridgeport UK**"); and to (c) $8,000,000 term loan to Bridgeport Machines GmbH (the "**German Term Loan**").  The Bank Facility is secured by all or substantially all of the assets of the Debtors, including, without limitation, (i) all inventory, accounts receivable, equipment, fixtures, investment property, general intangibles and all proceeds of any of the same, (ii) 100% of the capital stock of the Debtors, (iii) 66 2/3% of the capital stock of Bridgeport UK, Bridgeport Machines GmbH, Bridgeport Machines Vertriebs GmbH,

---

2    The Revolving Credit originally permitted borrowings in an amount up to $80,000,000. Pursuant to an amendment dated November 16, 1999, the maximum principal amount of the Revolving Credit was reduced to $71,000,000.  The Revolving Credit provides for borrowings by the Debtors and the Foreign Subsidiaries party thereto in U.S. dollars, British Pounds Sterling, and DeutchMarks.  The Revolving Credit includes sublimits pursuant to which Bridgeport UK could borrow up to GBP 15,000,000; Bridgeport's German subsidiaries could borrow up to DM 5,000,000, the borrowers could obtain letters of credit and/or guarantees by the Lenders of letter of credit obligations in an amount up to $5,000,000, and enter into foreign exchange transactions in a notional amount of up to $10,000,000.  All amounts borrowed under such sublimits  reduce borrowing availability under the Revolving Credit on a dollar-for-dollar basis.

and Goldman Industrial's other foreign subsidiaries, (iv) certain real property owned by the Debtors, and (v) intellectual property owned by the Debtors, including patents, trademarks and copyrights. The UK Term Loan is also secured by the assets of Bridgeport UK and the German Term Loan is also secured by the assets of Bridgeport Machines GmbH. If an event of default occurs, the Domestic Term Loan is paid only after the Revolving Credit, the UK Term Loan and the German Term Loan.

20. The Debtors and Bridgeport UK issued Senior Subordinated Notes due March 31, 2008, which were purchased by American Capital Strategies, Ltd., in the aggregate principal amount of $30,000,000 (the "**Subordinated Notes**"). The Debtors are obligated in respect of $25,000,000 original principal amount of the Subordinated Notes, and Bridgeport UK is obligated in respect of $5,000,000 of such Subordinated Notes. The Debtors have furthered guaranteed the payment by Bridgeport UK of its Subordinated Notes. The principal balance of the Subordinated Notes is payable in quarterly installments commencing July 1, 2005. The obligations of the Debtors and Bridgeport UK in respect of the Subordinated Notes are secured by liens on all or substantially all of the assets of the Debtors and Bridgeport UK, including, without limitation, (i) all inventory, accounts receivable, equipment, fixtures, investment property, general intangibles and all proceeds of any of the same, (ii) 66% of the capital stock of Bridgeport UK, (iv) all real property owned by the Debtors other than certain property owned by Jones & Lamson located on Clinton Street, Springfield, Vermont, and (iii) intellectual property owned by the Debtors, including patents, trademarks and copyrights. All such security interests and, liens and mortgages are subject and subordinate to the liens granted in favor of the Lenders to secure the Bank Facility.

**D.    Why Chapter 11**

21.    The machine tool industry has suffered in recent months due primarily to the overall decline in the United States economy. As the economy slowed, manufacturing businesses, which are the Debtors' primary customers, tended to delay, postpone or cancel capital improvement projects such as investment in manufacturing and equipment. Thus, demand for Debtors' products has diminished.

22.    The Debtors' businesses have declined for the past twelve months. The Debtors have instituted a number of cost-cutting measures, layoffs and consolidations to streamline their businesses. These measures did not halt the Debtors continuing operating losses.

23.    Since fall 2001, the Debtors have been engaged in negotiations and discussions with the Lenders regarding the provisions of the Bank Facility. The Bank Facility is currently in default.

24.    On February 11, 2002, the Lenders informed the Debtors that no further funding would be available unless these Cases were filed. Lacking any alternative source of funds, the Debtors filed these Cases on the Petition Date.

**II.    DEBTORS' FIRST DAY MOTIONS AND APPLICATIONS**

25.    Debtors have submitted a number of motions and applications with the petitions for relief under Chapter 11. Debtors believe the relief sought in these motions is essential to an orderly transition into and through Chapter 11 and successful reorganization. The background and support for certain of these first day pleadings is provided below.

## A.    Joint Administration Motion

26.    Joint administration of the Debtors' estates would reduce costs and facilitate administrative efficiency. Debtors believe it would be more efficient for the administration of these cases if their joint administration were authorized. Debtors anticipate significant activity during these cases and seek consolidation for procedural and administrative purposes only be the joint Administration Motion.

## B.    Bank Account and Business Forms Motion

### (1)    Cash Management System

21.    Debtors intend to continue to use their existing cash management system. This system is driven by the structure of the revolving credit extended to the Debtors by the Lenders (the "**Bank Facility**").

22.    Under the Bank Facility, the Lenders make regular deposits to master operating accounts maintained by four of the Debtors: Bridgeport, Hill-Loma, Bryant and Fellows. (Fellows also maintains this account for Debtor J&L Metrology, which is one of its subsidiaries.) Goldman Industrial received funding from Bridgeport, Hill-Loma, and Bryant and Fellows as necessary to meet operating requirements. Each of these Debtors also maintains specific operating accounts (e.g. for payroll and accounts payable), which are funded by that Debtor's master account. Direct payments for operating expenses are also made from the master accounts, as necessary.

23.    Cash receipts from sales of the Debtors' products are all deposited into lockbox accounts, maintained pursuant to agreements between the Debtors and the Lenders under the Bank Facility. (Some of these lockbox accounts are managed by the Lenders, and others by other banks.) Deposits of funds are made regularly from these

lockbox accounts to blocked depository accounts managed by the Lenders for payments on the debts of each of the four Debtors that hold the master accounts discussed above. These final deposits pay down the debt owed under the Bank Facility.

### (2)    Authority to Continue Use of Existing Bank Accounts

27.    Debtors use the Bank Accounts listed on Exhibit "A" to the Bank Account Motion.

28.    Debtors, employees, customers, and vendors could suffer confusion and hardship if Debtors were required to substitute new debtor-in-possession bank accounts for the existing Bank Accounts. Substitution of the bank accounts would inevitably lead to the same delays, confusion, and Disruption of Debtors' businesses that such approval seeks to avoid. By preserving business continuity and avoiding the operational and administrative paralysis that would result from closing Bank Accounts and opening new ones, all parties in interest would be served.

### (3)    Authority to Continue Use of Existing Business Forms

29.    To minimize expense to their estates, the Debtors also request authority to continue to use all stationery, correspondence and business forms (including, but not limited to, purchase orders, multi-copy checks, letterhead, envelopes, promotional materials and other business forms), as well as checks existing immediately before the Petition Date, without reference to their status as debtors-in-possession. Debtors request authority to purchase new business forms during the pendancy of these Cases, without any legend reflecting the Debtors' status as debtors-in-possession. However, any checks

ordered post-petition shall contain the designation of "debtor-in-possession" with the corresponding bankruptcy number as required by Del. Bankr. LR 1007-2.

30. The Debtors, in the ordinary course of their business, use various pre-printed business forms. A substantial amount of time and expense would be required in order to print new business forms and many of the parties with whom the Debtors deal could be confused by a change in the Debtors' forms. Furthermore, parties doing business with the Debtors will be aware of the Debtors' status as chapter 11 debtors-in-possession. Accordingly, changing such forms would be unnecessary and burdensome to the estates, as well as expensive and disruptive to the Debtors' business operations.

**(4)** **Authority to Continue Use of Employee Payment System**

31. The Debtors and certain nondebtor affiliates provide a number of goods and services to, and engage in intercompany financial transactions with, each other in the ordinary course of their respective businesses. In some circumstances, subsidiaries of Goldman Industrial purchase products from other subsidiaries. In other circumstances, Debtors perform services for or purchase services from other subsidiaries of Goldman Industrial.

32. These transactions are treated by Debtors and their nondebtor affiliates as arms-length, customer-supplier transactions. Transfers in the appropriate intercompany accounts are made with respect to each of these transactions.

**C.** **Employee Motion**

33. Debtors' workforce includes both hourly and salaried employees who worked pre-petition either full-time or part-time (collectively, "**Employees**"). Debtors

require the continued and uninterrupted service of its Employees in order to support continuing operations and the ability to reorganize.

34.    As of the Petition Date, many of the Employees were owed or had accrued various sums for: (a) wages, salaries, contractual compensation, sick pay, vacation pay (including "personal days"), holiday pay, bonuses, automobile allowances, and other accrued compensation; and (b) reimbursement of Employee business expenses, including but not limited to travel, lodging, temporary corporate housing, moving and other relocation expenses (collectively, "**Prepetition Compensation**").

35.    Debtors' hourly and salaried Employees are paid at various times, either monthly, weekly or bi-weekly based upon their status as a salaried or hourly employee and based upon the location of their employment, as reflected in **Exhibit A-1**, attached to the Wage Motion.

36.    In addition, as of the Petition Date, Debtors have made deductions from Employees' paychecks to make payments on behalf of Employees for 401(k) savings programs, benefit plans, insurance programs, union dues, charitable contributions, savings bonds, garnishments, support payments, and other similar programs on account of which Debtors ordinarily deduct a sum of money from an Employee's paycheck and pay that amount to a third party (collectively, "**Deductions**").

37.    Prepetition Compensation and Deductions were due and owing as of the Petition Date because, among other things:

    a.    Debtors filed their Chapter 11 petitions in the midst of regular and customary salary, compensation, and hourly wage payroll periods, as well

as in the midst of a regular reimbursement cycle for Employee business expenses,

b.      many payroll and expense reimbursement checks issued to Employees prior to or on the Petition Date have not yet been presented for payment or have not yet cleared the banking system and accordingly were not honored and paid as of the Petition Date,

c.      Employees have not yet been paid certain amounts of their salaries, contractual compensation and wages for services previously rendered to Debtors or have not yet been reimbursed for business expenses previously advanced on behalf of Debtors, and

d.      certain other forms of compensation (including sick pay, vacation pay, bonuses, payments into employee benefit plans, and withholdings for benefit plan contributions) related to prepetition services have not yet been paid to or for the benefit of Employees because such benefits, although accrued either in whole or in part prior to the Petition Date, were not payable at such time, but rather will become payable in the future in the ordinary course of Debtors' businesses.

38.      Debtors seek authority to pay or honor in the ordinary course of business all Prepetition Compensation and Deductions for active Employees that remained unpaid as of the Petition Date.  Debtors estimate that, as of the Petition Date, approximately $183,000 in Prepetition Compensation and Deductions had accrued but remains unpaid for active employees (including estimated checks issued but not cashed as of the Petition Date).  Tables setting forth the estimated amount of Prepetition Compensation and each

type of Deduction owed by the Debtors to their active Employees are attached to the Wage Motion as **Exhibit A-2** and **Exhibit A-3**, respectively, and incorporated into the Wage Motion reference. In addition, Debtors owe approximately $120,000 for Prepetition Compensation and Deductions to Employees that were terminated when certain of the Debtors were closed prepetition.

39.     Vacation time is accrued by Employees over the course of each year. Accrued vacation time can be used by an Employee during the year, at which point it is paid.  Employees who have accrued vacation time are not entitled to receive the cash value at this time, except to the limited extent that Employees generally are entitled to compensation for earned vacation time when such time is taken, and upon termination of employment, including upon retirement.   Debtors hereby seek authority to pay Employees the cash value of existing accrued (as of the Petition Date) vacation time when such vacation is taken in the ordinary course and/or upon an  Employee's voluntary or involuntary termination or resignation.

40.     Debtors have a number of employee benefit programs, including the health, dental, prescription drugs, vision, disability, life insurance, post-retirement healthcare programs, defined benefit and 401(k) and pension benefits.  As of the Petition Date, Debtors were obligated to pay certain contributions to or benefits under such benefit plans (Debtors' prepetition benefit obligations are collectively referred to as the "**Benefits**").

41.     Some Benefits remained unpaid as of the Petition Date because certain of Debtors' obligations under the applicable benefit plans accrued either in whole or in part prior to the commencement of these Cases, but will not become payable in the ordinary

course of Debtors' businesses until a later date. Debtors seek authority to pay, on the dates that Benefits would be due in the ordinary course, all Benefits that accrued but remained unpaid as of the Petition Date. Debtors estimate that the aggregate amount of such prepetition Benefits to active Employees is approximately $368,000.

42.     By the Wage Motion, Debtors respectfully request the entry of an order authorizing, but not requiring, the payment of the Prepetition Compensation, Deductions, and Benefits described herein. Any delay in paying Prepetition Compensation, Deductions, or Benefits would seriously harm Debtors' relationships with the Employees, would cause Employees economic harm, and could irreparably impair Employee morale at the outset of these Cases when the dedication, confidence, and cooperation of these Employees is most critical. Debtors face the imminent risk that their remaining operations may be severely impaired if they are not immediately granted authority to make the payments described in the Wage Motion.

43.     To enable the Employees to perform their jobs effectively, Debtors must continue corporate policies of permitting certain Employees to incur business and travel-related expenses and thereafter seek reimbursement by submitting appropriate invoices or vouchers evidencing such out-of-pocket disbursements. In the ordinary course of their business the Employees travel to meet with vendors, suppliers, and customers and are reimbursed for expenses incurred in connection therewith. Employees will be unwilling and unable to continue this vital business practice if they are not reimbursed for expenses incurred prepetition, thus irreparably injuring Debtors' businesses.

44.     Because the amounts represented by Prepetition Compensation and Deductions are needed to enable the Employees to meet their own personal obligations,

the Employees will suffer undue hardship and, in many instances, serious financial difficulties without the relief requested herein. Without the requested relief, Debtors' stability would be undermined at the outset of these cases.

45.     In the ordinary course of business, Debtors also withhold from Employees' paychecks various federal, state, and local income, FICA, and other taxes. Attendant to the payment of Employee wages, salaries, and expenses is Debtors' obligation to pay federal, state, and city withholding taxes, in some instances, and other payroll related taxes, including without limitation, Social Security taxes, Medicare taxes, and unemployment insurance taxes. These payroll obligations constitute "trust fund" taxes. The payment of such taxes will not prejudice other creditors of Debtors' estates, given that the relevant taxing authorities would hold a priority claim under section 507(a)(8) of the Bankruptcy Code in respect of such obligations and the trust fund taxes are not property of a debtor's estate. *See Begier v. Internal Revenue Service*, 496 U.S. 53 (1990). Such funds are not required to be counted against the $4,650 per employee cap contained in section 507(a)(3) of the Bankruptcy Code.

46.     Accordingly, Debtors seek authorization to pay all withholding taxes, payroll related taxes, tax deposits, and processing fees owed to the taxing authorities prior to the Petition Date. As set forth in the Bank Account Motion, Debtors also seek authorization to pay the withholdings and payroll taxes for Debtors under a common paymaster service. With respect to the withholdings and contributions to the 401(k) plans, life insurance and supplemental benefits, this will be completed by each respective Debtor company for their Employees, meaning there is not one common paymaster to complete these payroll withholding and remittance obligations.

47.     Debtors request that all involved banks and other financial institutions be authorized and directed to receive, process, honor and pay any and all checks drawn on Debtors' payroll and other disbursement accounts to pay Prepetition Compensation, Deductions, and Benefits, whether such checks were presented prior to or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make the payments. Debtors represent that these checks are drawn on identifiable payroll and disbursement accounts and can be readily identified as relating directly to the authorized payment of Prepetition Compensation, Deductions, or Benefits. Accordingly, Debtors believe that checks other than those relating to authorized payments will not be honored inadvertently.

48.     In the event checks issued prepetition for Prepetition Compensation, Deductions, and Benefits authorized by this Wage Motion are not honored, Debtors request permission to reissue those checks.

49.     Debtors also represent that there will sufficient cash available under the post-petition financing arrangements, if approved, to pay all Prepetition Compensation, Deductions, and Benefits, to the extent described herein, as such amounts become due in the ordinary course of their businesses.

## D.    Utilities Motion

50.    In the normal course of their businesses, the Debtors use natural gas, propane, water, electric, telephone, waste and other services provided by various utility companies (collectively, the "**Utility Companies**") as set forth in Exhibit "A" annexed to The Utilities.  Each of the utility services listed in Exhibit "A" is vital to the continued operation and the maintenance in good conditions of the Debtors' facilities and operations.

51.    Prior to the Petition Date, the Debtors made payments satisfactory to continue receiving utility services at all of their facilities.  Upon approval of the debtor-in-possession financing, the Debtors have financing to continue these payments. By virtue of the Utilities Motion, the Debtors are requesting immediate entry of an order (a) prohibiting the Utility Companies from altering, refusing or discontinuing services to, or discriminating against the Debtors, or requiring the payment of a deposit or other security in connection with a pre-petition invoice for utility services furnished to the Debtors; (b) deeming the Utility Companies to be adequately assured of future performance by their entitlement to an administrative expense claim until further order of this Court or an agreement between any Utility Company and the Debtors; (c) providing that if a Utility Company objects within thirty (30) days after entry of the order approving this Utilities Motion and requests additional adequate assurance that the Debtors believe is unreasonable, the Debtors shall file a motion to determine adequate assurance (the "**Determination Motion**") and shall set such motion for a hearing (the "**Determination Hearing**"); (d) providing that any Utility Company that does not  request additional adequate assurance within thirty (30) days after entry of an order approving the Utilities

Motion, shall be deemed to have adequate assurance pursuant to section 366 of the Bankruptcy Code; and (e) providing that, in the event a Determination Motion is filed or a Determination Hearing is scheduled, any objecting Utility Company shall be deemed to have adequate assurance of payment under section 366 of the Bankruptcy Code without the need for payment of additional deposits or other securities until an order of the Court is entered in connection with such Determination Motion or Determination Hearing.

52.     The Debtors propose to provide the Utility Companies adequate assurance by providing them administrative expense claims for utility services provided but not paid for during the pendency of these Cases, pursuant to sections 503(b) and 507(a)(1) of the Bankruptcy Code.  Moreover, the Debtors propose that their method of providing adequate assurance shall not prejudice the rights of any Utility Company to move this Court for additional assurance for itself, and that any burden of proof shall remain unaffected by approval of the methods proposed herein.

**E.      Supplier Motions**

**(1).    Critical Vendors Motion**

53.     By the Critical Vendors , Debtors request discretionary authority, pursuant to section 105(a) of the Bankruptcy Code and the well-established necessity-of-payment rule, to make payments (a) to certain critical vendors and suppliers up to an aggregate cap of $500,000 and (b) to Industrias Romi SA, ("**Romi**").

54.     Debtors have identified two groups of suppliers to whom Debtors anticipate it will be necessary to make payments in order to ensure the uninterrupted supply of goods:  Single Source Vendors (as defined below) and Romi.

55.     <u>Single Source Vendor Claims</u>:  Certain essential raw materials, supplies, and other services required to manufacture Debtors' products (collectively, the "**Single Source Goods**") are available only from a single supplier (collectively, the "**Single Source Vendors**").  For example, certain Single Source Vendors provide goods or services that allow the Debtors to meet the criteria and specifications of the Debtors' customers.  Any change in provider would require customer approval and would result in a production slowdown.  Because Debtors do not have any viable alternatives to obtain substitute goods or services from other suppliers, Debtors have determined that they must have the authority, in their discretion, to satisfy some or all of the prepetition claims of the Single Source Vendors (collectively, the "**Single Source Vendor Claims**") to ensure that these essential Single Source Goods will continue to be available without interruption.  In addition, many of the Single Source Vendors rely on Debtors for a substantial portion of their business or revenue, Debtors believe that these Single Source Vendors may not be able to absorb losses resulting from Debtors' failure to pay at least a portion of outstanding claims on ordinary business terms. Accordingly, any delay in paying the claims of these Single Source Vendors could force them into bankruptcy or

out of business, eliminating Debtors' sources of certain key supplies and services and jeopardizing Debtors' ability to maintain operations and reorganize successfully.

56.     Romi. Romi is the Debtors' sole source for 17 different castings as well as the sole source of a significant product line for Bridgeport. If Bridgeport and Romi were to agree to transfer casting production out of Romi, Bridgeport estimates that it would take at least three or four months to relocate production of the castings. The cost of production transfer itself would be at least $100,000, not counting disruption to the Debtors' business, even were Romi to make available at no cost all second generation castings, in which Romi holds a 50% ownership interest. To start over with new castings would cost Bridgeport at least $300,000. In addition, were the Romi relationship to terminate, Bridgeport would no longer have access to Romi-manufactured machines, which account for 20% of Bridgeport's sales through distributors. There is no readily available alternative to procure those machines.

57.     Romi is located in Brazil, where all credit extensions to foreign importers, such as Bridgeport, require the approval of Brazil's Central Bank. Credits are secured by insurance paid to the Central Bank in hard currency. The Central Bank may cancel the export license of a manufacturer such as Romi, when the Central Bank feels exposed.

58.     By October, 2001, Bridgeport was in arrears to Romi in the amount of $2.3 million. Bridgeport, Romi and the Central Bank agreed to a repayment scheme that required Bridgeport to keep current on new shipments and to pay off the arrearage in weekly installments of $50,000 (the "**Weekly Payments**").

59. Recently the repayment scheme was renegotiated so that Bridgeport was required to pay for new shipments with letters of credit. Bridgeport can receive additional shipments only if current on its Weekly Payments.

60. Bridgeport owes Romi approximately $1.6 million for past due invoices which Bridgeport agreed to pay in Weekly Payments. Bridgeport is currently $200,000 behind in its Weekly Payments to Romi.

61. Bridgeport needs Romi to continue operating and to reorganize successfully. Romi will not be able to retain its license and continue to ship goods to Bridgeport if the Weekly Payments are not current. Therefore, Debtors request authority to pay Romi up to $200,000 and to continue to make the Weekly Payments until Romi's prepetition debts are filed.

62. The prepetition claims of the Single Source Vendors and Romi are collectively referred to as the "**Critical Vendor Claims.**" Payment of these Critical Vendor Claims is vital to Debtors' reorganization efforts because (a) the goods and services provided by the Critical Vendors are often the only source from which Debtors can procure certain goods or services; (b) failure to pay the Critical Vendor Claims would, in Debtors' business judgment, likely result in the Critical Vendor terminating its provision of goods and/or services; (c) Debtors would likely be forced to pay a premium for replacement supplies, if available, because of the perceived risk of doing business in chapter 11 and because some of the Debtors' terms with existing Critical Vendors are more favorable than those available from other suppliers without regard to Chapter 11; (d) satisfying Critical Vendor Claims will ensure uninterrupted cash flow from the Debtors' businesses; and (e) the Critical Vendors may themselves be irreparably

damaged by Debtors' failure to pay their prepetition claims, resulting in the disruption or termination of flow of goods to Debtors.

63.     For these reasons, the Debtors believe that the payment of the Critical Vendor Claims in Debtors' sole discretion is essential, appropriate, and necessary to ensure that Debtors continue to receive essential services without interruption, thus preserving critical relationships with Debtors' customers and permitting Debtors to preserve their going concern value to the greatest extent possible. The Debtors believe that they should be authorized in their discretion to (a) make the payments to Romi provided for herein and (b) in their sole discretion, subject to the approval of Fleet Capital as agent for the Lenders, pay up to an aggregate of $500,000 to other Critical Vendors. Failure to grant the relief sought herein would severely impede Debtors' ability to obtain essential goods and services, operate their businesses and effectuate a successful reorganization.

**(2)     Shipping Charges Motion**

64.     By their Motion for Order Under 11 U.S.C. §§ 105(a) and 363 (c) Authorizing Payment of Certain Critical Prepetition Shipping Charges (the "Shipping Charges Motion"), the Debtors seek authority to pay prepetition shipping and import expenses, including customs duties, general order penalties, ocean freight, air freight, trucking charges, brokerage fees, detention and demurrage fees, surety bond premiums, amounts owed to Paying Agents (as defined below), consolidation and deconsolidation charges, and the like (collectively, the **"Shipping Claims"**), as the Debtors determine, in the exercise of their business judgment, may be necessary or appropriate to obtain goods

in transit and to satisfy the liens, if any, in respect thereof. The Debtors anticipate that such obligations will not exceed, in the aggregate, $50,000.

65. Additionally, the Debtors request that all banks and other financial institutions on which checks with respect to Shipping Claims that have been or may be drawn be authorized to receive, process, honor, and pay any and all such checks, whether presented prior to or after the Petition Date, upon the receipt by each such bank of notice of such authorization.

66. Finally, the Debtors request that any payment made to a third party on account of a prepetition claim discussed herein be subject to disgorgement in the event that such third party does not continue to provide services to the Debtors during the pendency of these Cases on the same terms as existed prior to the Petition Date.

67. In the normal course of their businesses, the Debtors pay certain fees and charges to commercial common carriers (the **"Shippers"**) and independent regional distributors (the **"Distributors"**) to ship, transport, store, and deliver goods, materials, products, supplies and related items.

68. Certain Shippers and Distributors periodically invoice the Debtors in arrears for services rendered, which will result in Shippers not having sought or received, as of the Petition Date, payment for all Shipping Claims arising prepetition.

69. The Debtors seek to pay the prepetition Shipping Claims for several reasons. First, if they are not paid, many Shippers may refuse to perform additional services for the Debtors. In such event, the Debtors will incur additional expenses, such as premium shipping costs, to replace Shippers, which amounts will likely exceed the

amount of unpaid prepetition Shipping Claims that the Debtors request permission to pay hereunder.

70.     Second, any delays in delivery with respect to goods that may be in the possession of Shippers as of the commencement of these Cases will result in the assertion, under applicable law, of possessory liens upon the Debtors' property in the possession of such Shippers and could disrupt the Debtors' inventory distribution network to the detriment of the Debtors' operations.

71.     Certain Shippers and Distributors periodically invoice the Debtors in arrears for services rendered, which will result in Shippers not having sought or received, as of the Petition Date, payment for all Shipping Claims arising prepetition.

72.     The Debtors seek to pay the prepetition Shipping Claims for several reasons. First, if they are not paid, many Shippers may refuse to perform additional services for the Debtors. In such event, the Debtors will incur additional expenses, such as premium shipping costs, to replace Shippers, which amounts will likely exceed the amount of unpaid prepetition Shipping Claims that the Debtors request permission to pay hereunder.

73.     Second, any delays in delivery with respect to goods that may be in the possession of Shippers as of the commencement of these Cases will result in the assertion, under applicable law, of possessory liens upon the Debtors' property in the possession of such Shippers and could disrupt the Debtors' inventory distribution network to the detriment of the Debtors' operations.

74.     Finally, some of the goods at issue, although not yet received by the Debtors, may be the subject of advertising and customer programs by the Debtors. If the

goods are not made available promptly, the Debtors may frustrate the expectations of their customers and lose customer goodwill. Such an outcome would harm the Debtors' reorganization efforts.

75.     In the ordinary course of their businesses, the Debtors purchase goods, materials, products, supplies, and related items from outside the country or countries where the particular Debtor has its primary operations (the **"Imported Goods"**), often at prices significantly lower than the cost of comparable domestic goods. The Debtors' purchase of the Imported Goods is vital to the operations of the Debtors' businesses.

76.     As of the Petition Date, the Debtors have already become indirectly obligated to pay in amount aggregating to approximately $36,000, for certain Imported Goods which they have not received, because such goods were either overseas, in transit to the United States, or awaiting U.S. Customs clearance.

77.     In connection with the Imported Goods, the Debtors have certain import expenses, including customs duties, general order penalties, ocean freight, air freight, trucking charges, warehousemen's claims, brokerage fees, detention and demurrage fees, surety bond premiums, consolidation and deconsolidation charges, and the like (the **"Import Obligations"**). Payment of the Import Obligations is necessary to obtain possession of the Imported Goods. Absent payment, the Debtors' customs brokers (the **"Customs Brokers"**) may assert shipper's and warehousemen's liens against the goods, and the United States Customs Service may assert a lien against such goods under 19 C.F.R. 141.1 (1994).

78.     Thus, payment of the Import Obligations will benefit the Debtors' estates because (a) the Debtors' manufacturing operations might otherwise be interrupted, (b) the

eventual sale of the products so imported will generate substantial gross income, (c) forfeiture of goods for which the Debtors have already become indirectly obligated will be avoided, and (d) important customer goodwill, based upon the availability of advertised products, will be protected.

79. In the ordinary course of business, the Debtors use Scott Traffic as third party paying agent (the **"Paying Agent"**), for certain shipping charges. The Paying Agent collects invoices in connection with various Shipping Claims, reconciles such invoices against the Debtors' records and then periodically bills the Debtors for amounts owed to the Shippers. Once payment from the Debtors is received, the Paying Agent cuts checks on the Debtors' behalf in payment of such Shipping Claims.

80. The Debtors do not have an alternative system in place to pay certain Shipping Claims absent the use of the Paying Agent. Therefore, the Debtors believe that the continued use of the Paying Agent to process invoices in connection with the Shipping Claims is critical to the Debtors' reorganization and, therefore, request authority to continue paying the Paying Agent all amounts owed for outstanding Shipping Claims, as well as the Paying Agent's standard fees for processing and paying such Shipping Claims, including payment of any prepetition amounts outstanding, in the ordinary course of business.

81. In sum, the Debtors submit that paying the Shipping Claims is critical to maintaining the value of the Debtors' business. The Debtors' ability to sustain their current operations and ultimately to reorganize their businesses depends upon the Debtors' ability to maintain their distribution network and to provide appropriate levels of service and a steady supply of goods, including Imported Goods, to their customers.

### (3)    Reclamation Motion

82.    Debtors anticipate receiving demands during the early days of these cases from numerous vendors asserting such vendors' purported rights of reclamation pursuant to section 2-2702(2) of the Uniform Commercial Code (the "**UCC**") and Section 546(c) of the Bankruptcy Code (each a "**Reclamation Claim**") and, collectively, the "**Reclamation Claims**").  The Reclamation Claims, if properly asserted, will request that the Debtors either return, or pay for in full, certain goods identified in the Reclamation Claim (the "Goods").

83.    By the Reclamation Motion, Debtors request that the Court establish procedures for addressing reclamation claims likely to be asserted against Debtors by numerous vendors.  Debtors believe that such procedures, will simplify the process of addressing such claims while adequately safeguarding the reclamation rights of the creditors asserting them.

### (4)    Customer Programs Motion

84.    In the ordinary course of their businesses, the Debtors maintain certain policies for the benefit of the customers of their manufacturing businesses.  The program and policies maintained by the Debtors include customer return and warranty programs, rebates, and incentive programs (collectively, the "**Customer Programs**") and are often customized to meet the needs of individual customers.

85.    In the Debtors' business judgment, the uninterrupted maintenance of their Customer Programs is essential to attracting new customers and maintaining existing customer satisfaction.  The markets for certain of the Debtors' products are highly competitive, and the Customer Programs are integral to the Debtors' ability to induce

customers to purchase Debtors' products. Discontinuation of the Customer Programs would thus disrupt business operations and undermine the Debtors' relationship with its customers.

86.      End users of the Debtors' products buy both directly from Debtors, Debtors' customers or other companies to which the Debtors' customers sell products.

87.      To accommodate the needs of their customers the Debtors maintain various customer return programs and warranty programs under which the Debtors' pay warranty claims. Through these warranty programs, the Debtors reimburse their customers for their efforts and expenditures in handling warranty claims. The Debtors often provide these reimbursements through setoffs or deductions related to the customers' purchase orders, and no actual cash outlay by the Debtors is required. As of the Petition Date, the Debtors have reserved on their books and records approximately $1,770,000 on account of estimated future obligations under the warranty programs.

88.      Moreover, as of the Petition Date, certain of Debtors' customers owe money to the Debtors for goods purchased from them. Accordingly, if the Debtors do not receive authority to continue and to honor Customer Programs as requested herein, customers that owe money to the Debtors likely could and would assert the right to setoff payments owed to them by the Debtors against the respective amounts they owe to the Debtors.

89.      The Debtors believe that honoring the existing Customer Programs is critical to their continued operations. In the competitive markets in which the Debtors' products are sold, even a short delay by the Debtors in continuing their Customer Programs could cause serious and irreparable harm to the value of the Debtors' estates.

90.     The Debtors submit that the total amount to be paid or credited to customers if the Court grants the requested relief is minimal compared with the losses that the Debtors could suffer if the patronage of their customers erodes at the outset of these Cases. In sum, maintenance of the Customer Programs is essential to the continued vitality of the Debtors' businesses and, ultimately, to their prospects for a successful reorganization. The Debtors thus submit that permitting them to continue the Customer Programs is in the best interests of their estates, their creditors, and all other parties in interest.

## F.     **Retention and Compensation of Professionals**

### (1)     **Retention of Greenberg Traurig as Counsel**

91.     The Debtors desire to retain and employ Greenberg Traurig as their attorneys in these Cases. By this Application, the Debtors respectfully request that this Court enter an order authorizing the Debtors to employ and retain Greenberg Traurig as their attorneys under a general, advance payment.

92.     The Debtors seek to retain Greenberg Traurig as their attorneys because of the firm's extensive general experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code; its expertise, experience and knowledge practicing before this Court; its proximity to the Court; and its ability to respond quickly to emergency hearings and other emergency matters in this Court. The appearance of Greenberg Traurig before this Court for the applications, motions and other matters in these Cases will be efficient and cost effective for the Debtors' estates. The Debtors believe that Greenberg Traurig is both well-

qualified and uniquely able to represent them in their Cases in a most efficient and timely manner.

93.    Moreover, Greenberg Traurig is well suited for the type of representation required by the Debtors.  Greenberg Traurig is a large national firm with close to 800 attorneys and 17 offices throughout the country, primarily focused on the Atlantic Seaboard and Midwest.  The members of the firm practice in almost every area of the law, including bankruptcy, workouts, litigation, business and commercial law, energy, environmental, real estate, and securities law.  Accordingly, the Debtors have determined that Greenberg Traurig has the resources and experience necessary to represent them in these Cases.

94.    Greenberg Traurig has become intimately familiar with the Debtors' businesses and operations.  Thus, the Debtors desire that Greenberg Traurig continue to represent them in connection with these Cases.  The Debtors believe that Greenberg Traurig's employment is in the best interest of the Debtors, their estates and their creditors.

95.    The Debtors desire to retain Greenberg Traurig under a general, advance payment retainer because of the extensive legal services that may be required by the Debtors and the fact that the nature and extent of such services are not known at this time. The professional services Greenberg Traurig is expected to render include, but shall not be limited to, the following:

(a)    providing legal advice with respect to the Debtors' powers and duties as debtors-in-possession in the continued operation of their business and management of their property;

(b)    negotiating, drafting and pursuing confirmation of a plan of reorganization and approval of an accompanying disclosure statement;

(c)     preparing on behalf of the Debtors necessary applications, motions, answers, orders, reports and other legal papers;

(d)     appearing in Court and to protect the interests of the Debtors before the Court;

(e)     assisting with any disposition of the Debtors' assets, by sale or otherwise; and

(f)     performing all other legal services for the Debtors which may be necessary and proper in these proceedings.

**(2).     Morris Anderson & Associates, Ltd. As Financial and Recruiting Advisors**

96.     The Debtors propose to retain Morris Anderson to provide financial advisory and restructuring services in these Cases on terms and conditions substantially the same as those described in the Dooley Affidavit attached hereto.  By this Application, the Debtors request that the Court enter an order authorizing the Debtors to employ and retain Morris Anderson as financial advisor, effective as of the Petition Date, with regard to the matters described below, pursuant to section 327(a) of the Bankruptcy Code.

97.     Morris Anderson is well suited to provide the type of services required by the Debtors.

98.     The Debtors anticipate that Morris Anderson will act effectively to provide financial advisory and restructuring services to the Debtors as needed throughout the course of these Cases.  As a leading provider of financial restructuring services, Morris Anderson has substantial expertise in providing the following specific services required by the Debtors:

a. Manage the day-to-day operations and businesses of the Debtors

b. Manage the Chapter 11 process for the Debtor and interface directly with Chapter 11 counsel;

c. Supervise the banking relationships, cash management and budgeting process for the Debtor;

d. Supervise the management employees of the Debtor;

e. Make recommendations regarding the hiring and firing of management personnel of the Debtor;

f. Develop restructuring plans, including plans for restructuring  assets and for sale divestitures, liquidations or disposition of assets of the Debtors;

g. Implement strategic direction and alternatives for the Debtors; and

h. Perform such other functions as are consistent with this Agreement and as directed by the Debtor.

**(3)     Application to Employ BSI as Claims Agent**

99.     As of the Petition Date, the Debtors had approximately 1500 creditors, potential creditors and shareholders.

100.     Upon information and belief, the office of the Clerk of the Bankruptcy Court for the District of Delaware (the **"Clerk's Office"**) is not equipped to efficiently and effectively serve notice on the creditors in these Cases. Moreover, Del. Bankr. LR 2002-1(f) provides that in cases with more than 200 creditors, the debtor shall file a motion to retain a notice or claims agent.

101.    Del. Bankr. LR 2002-1(f) requires that the Motion be filed on the first day of the case or within 10 days thereafter.  By this Motion, the Debtors move this Court for entry of an Order retaining BSI as notice and claims agent for the reasons set forth herein.

102.    The Debtors respectfully submit that the most effective and efficient manner by which to accomplish the process of noticing creditors of the filing of these Cases, and to transmit, receive, docket, maintain, photocopy and microfilm claims, is for the Debtors to engage an independent third party to act as an agent of the Court.

103.    The Debtors propose to employ BSI as notice and claims agent (the "Notice and Claims Agent"), among other things, to assist the Debtors in distributing notices, as necessary, and process other administrative information pertaining to these Cases and to serve as claims agent. The Debtors believe that BSI is well-qualified to serve in this capacity and that BSI's retention is in the best interests of the Debtors' estates.  The Debtors chose BSI based on both its experience and the competitiveness of its fees.

### (4)    Motion for Interim Compensation for Retained Professionals

104.    By their Motion for an Order establishing Procedures for Interim Compensation and Reimbursement of Chapter 11 Professionals and Committee Members (the "**Interim Compensation Motion**"), the Debtors request establishment of procedures for compensating and reimbursing court-approved professionals (other than those to be retained pursuant to the Ordinary Course Professionals Motion described below), on a monthly basis.

105.    The requested procedures require each professional subject to these procedures to present to Debtors' counsel the United States Trustee, counsel for the

Debtors' prepetition secured lenders, counsel for the Debtors' debtor-in-possession financing lenders, and counsel for the Committee (once appointed) a statement of services rendered and expenses incurred by the professional each month. Debtors would be authorized to pay eighty percent (80%) of the amount of fees incurred for the month (maintaining a twenty percent (20%) holdback) plus one hundred percent (100%) of expenses or other disbursements as posted during the billing period, or such other amount as the Court may authorize. Payments would be subject to the Court's subsequent approval as part of the normal interim fee application process, approximately every 120 days.

        **(4)      Ordinary Course Professionals Motion**

106.    Prior to the Petition Date, Debtors used a number of Professionals in the ordinary course of business (collectively, "**Ordinary Course Professionals**"). The continued availability of the services of the Ordinary Course Professionals is essential to Debtors' operations and also critically important to ensure the efficient administration of Debtors estates.

107.    By the Ordinary Course Professionals Motion, Debtors request that the Court authorize them to employ, retain, and compensate the Ordinary Course Professionals, subject to certain limitations, for specific services to be rendered to Debtors in the ordinary course of Debtors' businesses. In addition, Debtors request authorization to supplement the list of Ordinary Course Professionals from time to time.

**F.       Tax Motion**

108.    In the ordinary course of their business, the Debtors are obliged to pay

certain sales, use, and trust fund taxes (collectively, the "**Taxes**") to the appropriate

taxing authorities (collectively, the "**Taxing Authorities**").  Through the Tax Motion, the

Debtors seek authority to pay those Taxes accrued prior to the Petition Date but not yet

remitted by the Debtors to the applicable Taxing Authority (collectively, the "**Tax**

**Obligations**").

109.    Because Tax Obligations that constitute trust fund taxes do not constitute

property of the Debtors' estates, these amounts will not otherwise be available to the

Debtors or their creditors.  Thus, the payment of the Tax Obligations that are trust fund

taxes will not adversely affect the rights of the parties in these cases and is warranted.

110.    Moreover, many state and local Taxing Authorities impose personal

liability on the officers and directors of entities responsible for paying taxes to the extent

that any such taxes are owing but not remitted.  Thus, if any Tax Obligations remain

unpaid, the Debtors' officers and directors may be subject to lawsuits or even criminal

prosecution on account of such nonpayment during the pendency of these Cases.  Such

lawsuits or proceedings would constitute a significant distraction for officers and

directors at a time when they should be focused on successfully and expeditiously

implementing the Debtors' reorganization process.  It is therefore in the best interests of

the Debtors and their respective estates to eliminate the possibility of such distractions by

permitting the Debtors to pay the Tax obligations.

111.    Furthermore, the Debtors believe that some, if not all, of the relevant

Taxing Authorities may cause the Debtors to be audited if the Debtors' respective Tax

Obligations are not paid promptly. Such audits would further divert the Debtors' attention and resources from the reorganization process.

### G.   DIP Financing Motion

112.   The Debtors have insufficient cash to meet ongoing obligations necessary to maintain their businesses or preserve the value of estate assets. Specifically, without additional financing, the Debtors can neither maintain their business operations nor pay undisputed ordinary-course operating expenses associated with their businesses.

113.   If the Debtors are not granted access to the funds being made available under the Post-Petition Financing proposed in the DIP Financing Motion, the Debtors' estates and creditors will be materially adversely affected. Without an immediate infusion of cash, the Debtors' business operations and supervision requirements will be severely disrupted. Such a result would severely diminish, if not extinguish, the Debtors' going concern value.

114.   The Debtors negotiated the terms of the Post-Petition Financing with the Post-Petition Lenders at arm's-length and in "good faith" (as that term is defined in section 364(e) of the Bankruptcy Code), with all parties represented by experienced counsel. The Debtors' liquidity crisis is so acute, their operations and corporate structure so complex that it was not possible to negotiate alternative financing with any lender other than the Post-Petition Lenders, which is already intimately familiar with the Debtors' operations, corporate structure and financial arrangements. The Debtors do not believe that any other lender would be able to offer acceptable financing on the Debtors' expedited need, if at all.

115.    The Post-Petition Lenders presented the Debtors with an arrangement that will allow the Debtors to meet their immediate financing needs.  If interim relief is not obtained, the Debtors' attempt to reorganize will be immediately and irreparably jeopardized, to the detriment of their estates, their creditors and other parties in interest.

116.    The Debtors believe that the terms and conditions of the Post-Petition Financing are fair, reasonable and in the best interests of the Debtors' estates.

**H.    The Chapter 11 Petition  and Related Disclosures**

117.    Concurrently herewith, Debtors have filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Pursuant to Rule 1007-2(a)(1), a statement regarding the nature of Debtors' businesses and the circumstances leading to the filing of their Chapter 11 petitions is set forth in Part I above.

118.    Neither a case under the former Bankruptcy Act nor a case under the Bankruptcy Code is currently pending by or against Debtors.  These cases were not originally commenced under Chapter 7, Chapter 12, or Chapter 13 of the Bankruptcy Code.

119.    Pursuant to Rule 1007(d) of the Federal Rules of Bankruptcy Procedure and LBR 1007-2, a list of the names and addresses of Debtors' twenty largest unsecured creditors, excluding insiders, annexed toe ach of the Chapter 11 petitions commencing these Cases.

120.    To the best of my knowledge, none of Debtors' property is in the possession of a custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity.

121. Debtors operate their business from offices located at One Post Office Square, Suite 4100, Boston, Massachusetts, 02109.

122. Debtors' assets are all located in the United States. Debtors' consolidated books and records are located in the Boston office.

123. While several proceedings are in various stages of litigation, to the best of my knowledge, no action or proceeding is pending or threatened against Debtors or their property where a judgment against Debtors or a seizure of property may be imminent.

124. In addition to the foregoing information, on the Petition Date the Debtors filed with the Court a consolidated list containing the name and address of each known or potential creditor.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

I, RICHARD E. CLEMENS, declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge, information and belief.

Richard E. Clemens
Chief Operating Officer
Goldman Industrial Group, Inc.,
Fellows Corporation,
Bryant Grinder Corporation,
Bridgeport Machines, Inc.
J&L Metrology Company, Inc.
Jones & Lamson Vermont Corp.., and
Hill-Loma, Inc.

Sworn to before me this day
13th of February, 2002

KAREN M. CIAMPA
Notary Public
Commission Expires
June 2 2006